# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| JOHN M. SCHULZ,<br>Derivatively on Behalf of MALIBU BOATS, INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>JACK D. SPRINGER, RITCHIE L. ANDERSON, BRUCE W. BECKMAN, DAVID S. BLACK, WAYNE R. WILSON, JAMES R. BUCH, IVAR S. CHHINA, MICHAEL J. CONNOLLY, MICHAEL K. HOOKS, MARK W. LANIGAN, JOAN M. LEWIS, PETER E. MURPHY, JOHN E. STOKELY, and NANCY M. TAYLOR,<br><br>Defendants,<br><br>– and –<br><br>MALIBU BOATS, INC.,<br><br>Nominal Defendant | Civil Action No.<br><br>**DEMAND FOR JURY TRIAL** |

# VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff John M. Schulz ("Plaintiff"), by and through his undersigned attorneys, brings this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Malibu Boats, Inc. ("Malibu" or the "Company"), against Individual Defendants Jack D. Springer ("Springer"), Ritchie L. Anderson ("Anderson"), Bruce W. Beckman ("Beckman"), David S. Black ("Black"), Wayne R. Wilson ("Wilson"), James R. Buch ("Buch"), Ivar S. Chhina ("Chhina"), Michael J. Connolly ("Connolly"), Michael K. Hooks ("Hooks"), Mark W. Lanigan ("Lanigan"), Joan M. Lewis ("Lewis"), Peter E. Murphy ("Murphy"), John E. Stokely ("Stokely"), and Nancy M. Taylor ("Taylor") (collectively, the "Individual Defendants") for their breaches of fiduciary duties as directors and/or officers of Malibu, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by Malibu with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     INTRODUCTION

1.     This is a shareholder derivative action brought against certain current and former Malibu officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants from November 4, 2022 through the present (the "Relevant Period"). The wrongdoing alleged herein has caused substantial

damage to Malibu's reputation, goodwill, and standing in the business community and has exposed Malibu to substantial potential liability for violations of federal securities laws and the costs associated with defending itself.

2. Malibu designs, manufactures, and markets recreational powerboats, which include performance sport, sterndrive, and outboard boats. The Company sells its boats via a network of independent dealers, including dealers operating under the common control of Tommy's Boats ("Tommy's"). In fiscal year ("FY") 2023, sales to Tommy's dealers represented approximately 23.3% of consolidated sales for Malibu brand boats and approximately 10.7% of the Company's consolidated net sales.

3. Leading up to the Relevant Period, the boating industry experienced a COVID 19-fueled sales boom as socially distancing customers flocked to buy boats. At this time, Malibu's sales skyrocketed, growing 42% from FY 2020 to FY 2021, and another 30% from FY 2021 to FY 2022. By mid-2022, however, the boat sales boom was losing momentum, with industry sources forecasting retail demand for 2023 to sharply decline by 50% from 2022 levels.

4. In contrast to the Individual Defendants' public statements at the time, the retail demand for Malibu's products was severely impacted by the slowdown in the boat market and the broader economy during the Relevant Period.

5. On February 20, 2024, before the market opened for trading, the Individual Defendants caused Malibu to announce that the Company and its Chief Executive Officer ("CEO"), defendant Springer, had "mutually agreed" that defendant Springer would no longer serve as CEO. No other reason for his departure was provided. On this news, the Company's stock price fell $4.33 or over 9%, to close at $43.15 per share on February 20, 2024, on unusually heavy trading volume.

6.      On April 11, 2024, after the market closed, the Individual Defendants caused the Company to reveal that Tommy's had sued Malibu in the U.S. District Court for the Eastern District of Tennessee,  alleging that the Company had "engaged in an elaborate scheme" to "pump nearly $100 million" worth of inventory into Tommy's dealerships since late 2022 to "artificially inflate Malibu's sales performance."[1] According to the complaint filed in the Tommy's Action, Malibu forced the Company's highest priced, highest margin, slower selling "Malibu" branded inventory (as opposed to the lower margin, but faster selling "Axis") brand onto Tommy's dealerships.

7.      The Company recognizes a sale once a dealer accepts delivery of the boat, regardless of whether it has been sold to the end user. This alleged channel stuffing scheme allowed the Individual Defendants to report that Malibu experienced strong wholesale demand and sales, even as the end user demand declined. Thus, through this scheme, the Individual Defendants caused Malibu to continue to report strong sales while forcing Tommy's to become inundated with unneeded boats. Moreover, the Company allegedly withheld incentive payments it owed Tommy's for nearly two years before Malibu abruptly cut ties with Tommy's.

8.      Further, the Individual Defendants had considerable leverage over Tommy's because it was heavily dependent on Malibu for its business, as the Company's boats made up more than 80% of Tommy's sales. When the COVID-sales boom began to wane, the Individual Defendants began pressuring Tommy's into purchasing millions worth of unneeded, high-margin Malibu boats and increasing its dealership "floor plan" financing limits with lenders by 70%,

---

[1]      The complaint was filed in the Eastern District of Tennessee, styled *Tommy's Castaic, LLC et al v. Malibu Boats, Inc. et al*, Case No.: 3:24-cv-00166 (the "Tommy's Action"). The Tommy's Action was voluntarily dismissed on August 19, 2024 as part of a settlement, with Malibu agreeing to pay $3.5 million to Tommy's. The settlement also required Malibu to drop its $9.6 million claim against Tommy's in the bankruptcy case discussed herein.

from $50 million to $85 million, so that Tommy's could purchase and store the additional Malibu boats. Moreover, defendants Springer and Wilson threatened the head of Tommy's that Tommy's would lose its status as a Malibu authorized dealer if it did not take on the unneeded boats.

9.     On this news, the Company's stock price fell $3.34, or nearly 8%, to close at $38.48 per share on April 12, 2024. The Company's common stock price continued to fall during the next trading session, declining $2.34 or 6% to close at $36.14 per share on April 15, 2024. The Company's stock price has only continued to decline since, and currently trades for approximately $27 per share.

10.     Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose materially adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to stockholders that: (1) the Individual Defendants engaged in and/or permitted an "elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen Tommy's dealerships"; (2) the Individual Defendants caused or permitted the artificially inflation of Malibu's sales performance, market share, and stock value; (3) the Individual Defendants caused the Company to withhold certain incentives and rebates from its dealers; (4) the Company faced substantial risk of litigation from one of its top dealers, Tommy's; (5) the Company's CEO left Malibu due to his role in the illicit scheme described herein; and (6) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business operations, and prospects were materially misleading and/or lacked a reasonable basis.

11.     To make matters worse, defendant Springer, along with other Individual

Defendants, caused the Company to engage in the illicit scheme to dump inventory onto dealers in a concerted effort to misrepresent the Company's financial position, thus securing generous compensation and other lucrative financial awards for members of senior management, as enumerated in the Company's Annual Proxy Statements filed with the SEC on September 15, 2023, and September 19, 2024.

12. As set forth herein, and as alleged in the ongoing federal securities class action in the U.S. District Court for the Southern District of New York styled *Retiree Benefit Trust of the City of Baltimore v. Malibu Boats, Inc., et al*, Case No. 1:24-cv-03254-LGS, (the "Securities Class Action"), Malibu's officers and directors substantially damaged the Company by repeatedly issuing false and misleading statements that omitted material adverse facts.

## II.   THE PARTIES

### A.   Plaintiff

13. Plaintiff is a current Malibu stockholder and has continuously held Malibu common stock since December 19, 2022.

### B.   Nominal Defendant

14. Nominal defendant Malibu is a Delaware corporation with its principal executive offices located at 5075 Kimberly Way, Loudon, Tennessee 37774. Malibu's shares trade on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "MBUU."

### C.   The Individual Defendants

15. Defendant Springer served as the Company's CEO from February 2010 to May 2024. He was a member of the Board from the Company's initial public offering ("IPO") in February 2014 until his resignation in May 2024. He was also a director of Malibu Boats Holdings, LLC ("MBH") from May 2009 until the Company's recapitalization in connection

with the IPO in February 2014. During the Relevant Period, defendant Springer received at least $7,459,329 in total compensation from the Company. During the Relevant Period, defendant Springer sold over $1.5 million worth of Malibu stock based on material nonpublic information ("MNPI").

16.     Defendant Anderson has served as the Company's President since February 2024. After the departure of defendant Springer in 2024, he served as a member of the Office of the CEO from May 2024 to August 2024. Defendant Anderson previously served as the Company's Chief Operating Officer ("COO") from September 2013 until his appointment as CEO. He joined the Company in July 2011 as the Company's Vice President of Operations. During the Relevant Period, defendant Anderson has received at least $7,185,139 in total compensation from the Company. During the Relevant Period, defendant Anderson sold over $1 million worth of Malibu common stock while in possession of MNPI.

17.     Defendant Beckman has served as the Company's Chief Financial Officer ("CFO") since November 2023. During the Relevant Period, defendant Beckman has received at least $1,142,266 in total compensation from the Company.

18.     Defendant Black served as the Company's Interim CFO from April 2023 to November 2023. Defendant Black has also served as the Company's Corporate Controller since November 2020. Previously, defendant Black served as the Company's Director of Internal Audit. During the Relevant Period, defendant Black received at least $1,206,699 in total compensation from the Company.

19.     Defendant Wilson served as the Company's CFO from November 2009 to May 2023. During the Relevant Period, defendant Wilson received at least $1,340,666 in total compensation from the Company.

20.     Defendant Buch has served as a Company director since the Company's IPO in February 2014. Defendant Buch is a member of the Audit Committee and the Nominating and Governance Committee. During the Relevant Period, defendant Buch received at least $364,178 in total compensation from the Company.

21.     Defendant Chhina has served as a Company director since the Company's IPO in February 2014. Defendant Chhina is Chair of the Audit Committee and is a member of the Nominating and Governance Committee. During the Relevant Period, defendant Chhina received at least $394,219 in total compensation from the Company.

22.     Defendant Connolly has served as a Company director since the Company's IPO in February 2014. Defendant Connolly is Chair of the Nominating and Governance Committee and is a member of the Compensation Committee. During the Relevant Period, defendant Connolly received at least $380,200 in total compensation from the Company.

23.     Defendant Hooks has served as a Company director since the Company's IPO in February 2014 and is currently Chairman of the Board. He was also a director of MBH from May 2009 until the Company's recapitalization in connection with the February 2014 IPO. Defendant Hooks is a member of the Nominating and Governance Committee. During the Relevant Period, defendant Hooks received at least $433,606 in total compensation from the Company.

24.     Defendant Lanigan has served as a Company director since the Company's IPO in February 2014. Defendant Lanigan was also a director of MBH from May 2009 until the Company's recapitalization in connection with the February 2014 IPO. Defendant Lanigan is Chair of the Compensation Committee and is a member of the Nominating and Governance Committee. During the Relevant Period, defendant Lanigan received at least $384,205 in total

compensation from the Company.

25.     Defendant Joan M. Lewis ("Lewis") served as a Company director from July 2019 until August 2024. Defendant Lewis was a member of the Compensation Committee and the Nominating and Governance Committee. During the Relevant Period, defendant Lewis received at least $364,178 in total compensation from the Company.

26.     Defendant Peter E. Murphy ("Murphy") has served as a Company director since the Company's IPO in February 2014. Defendant Murphy is a member of the Compensation Committee and the Nominating and Governance Committee. During the Relevant Period, defendant Murphy received at least $451.678 in total compensation from the Company.

27.     Defendant Stokely has served as a Company director since the Company's IPO in February 2014. Defendant Stokely is a member of the Audit Committee and the Nominating and Governance Committee. During the Relevant Period, defendant Stokely received at least $364,178 in total compensation from the Company.

28.     Defendant Taylor has served as a Company director since April 2023. Defendant Taylor is a member of the Audit Committee and the Nominating and Governance Committee. During the Relevant Period, Defendant Taylor received at least $258,984 in total compensation from the Company.

29.     Defendants Springer, Anderson, Beckman, Black, and Wilson may collectively be referred to herein as the "Officer Defendants."

30.     Defendants Springer and Anderson may collectively be referred to herein as the "Insider Trading Defendants."

### III.     JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

32.     This Court has personal jurisdiction over each defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

33.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

34.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) Malibu maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

35.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Malibu and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Malibu in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Malibu and its stockholders to benefit all stockholders equally and not furtherance of their personal interest or

benefit.

36.     Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Malibu, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Malibu each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

38.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

a.     Ensure that the Company complied with its legal obligations and requirements—

including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

b.　　Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the U.S. pursuant to the Company's own Code of Conduct (the "Code of Conduct");

c.　　 Conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

d.　　Remain informed as to how Malibu conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

e.　　Establish and maintain systematic and accurate records and reports of the business and internal affairs of Malibu, as well as procedures for reporting said reports and records to the Board, and periodically investigate, or cause independent investigation to be made of, said reports and records;

f.　　Maintain and implement and adequately functioning system of internal, legal, financial, and management controls such that Malibu's operations comply with all applicable laws and that the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and Company's shareholders are accurate;

g.　　Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports of information that the Company was required by law to disseminate;

h. Examine and evaluate any reports of examination, audits, or other information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subject and duties set forth above; and

i. Truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

39. The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein and the content of the various public statements issued by Malibu.

40. At all times relevant hereto, the Individual Defendants were the agents of each other and of Malibu and were at all times acting within the course scope of such agency.

## THE COMPANY'S CODE OF CONDUCT

41. The Individual Defendants, as officers and/or directors of Malibu, were bound by the Company's Code of Conduct, which stated the following:

> We will uphold the highest professional standards in all global business operations. We expect every director, officer and employee to read and understand the Code and its application to the performance of his or her business responsibilities. Please remember that you should consider not only your own conduct but also that of your immediate family members, your significant other or other persons who live in your household (referred to in the Code as "family members"). Likewise, the ethics of our suppliers, service providers and business partners is of utmost importance. We expect those with whom we do business to have, and follow, a similar code of ethical conduct. This Code requires unequivocally:
>
> - Compliance with all applicable governmental laws, rules and regulations wherever Malibu operates;
> - Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, and the appropriate self-disclosure to Malibu of any material transaction or relationship that reasonably could be expected to give rise to such a conflict;
> - Full, fair, accurate, timely and understandable reporting in Malibu's books

and records and in all reports and documents that Malibu files with, or submits to, our external investors, accountants and auditors and in other public communications made by Malibu;
-   Prompt internal reporting of violations of this Code or of any law affecting Malibu's business; and - Accountability for failures to this Code

While we are all obligated to follow this Code and are responsible and accountable for our own conduct, Malibu expects our leaders to set the example - to be in every respect a model. They must ensure that those who report to them have sufficient information to comply with law, regulation and policy, as well as the resources to resolve ethical dilemmas. They must foster and maintain a culture within Malibu that promotes the highest standards of ethics and compliance. We must never sacrifice ethical behavior and legal compliance in the pursuit of business objectives. Everyone is responsible and accountable for promptly reporting any potential violations of this Code or any law or regulation. We must do more than follow the letter of the law – we must do the right thing. Above and beyond strict legal compliance, each director, officer and employee is expected to observe high standards of business and personal ethics in the discharge of their assigned duties and responsibilities. This requires the practice of fair dealing, honesty and integrity by each director, officer and employee in every aspect of dealing with other Malibu employees, the public, the business community, stockholders, customers, suppliers, competitors and governmental and regulatory authorities.

42.     The "Fair Dealing" section of the Code of Conduct states the following:

We strive to outperform our competition fairly and honestly. Advantages over our competitors are to be obtained through superior performance of our products and services, not through unethical or illegal business practices. Statements regarding Malibu's services must not be untrue, misleading, deceptive or fraudulent. Acquiring proprietary information from others through improper means, possessing trade secret information that was improperly obtained, or inducing improper disclosure of confidential information from past or present employees of other companies is prohibited, even if motivated by an intention to advance our interests. If information is obtained by mistake that may constitute a trade secret or other confidential information of another business, or if you have any questions about the legality of proposed information gathering, you must consult your supervisor or the Compliance Officer.

You are expected to deal fairly with our customers, suppliers, employees and anyone else with whom you have contact in the course of performing your job. Be aware that the Federal Trade Commission Act provides that "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful." It is a violation of the Act to engage in deceptive, unfair or unethical practices and to make misrepresentations in connection with sales activities.

Employees involved in procurement have a special responsibility to adhere to principles of fair competition in the purchase of products and services by selecting suppliers based exclusively on normal commercial considerations, such as quality, cost, availability, service and reputation, and not on the receipt of special favors.

43.     The "Insider Trading" section of the Code of Conduct states the following:

Directors, officers and employees who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about the Company or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Directors, officers and employees must exercise the utmost care when handling material inside information. Please refer to the Company's Insider Trading Policy for more detailed information.

44.     The "Administration – Compliance Program and Compliance Officer" section of the Code of Conduct states the following:

To facilitate compliance with this Code, we have implemented a compliance program ("Compliance Program") discussed below. We have established the position of the Compliance Officer to oversee this program. The Compliance Officer is a person to whom you can address any questions or concerns. The Compliance Officer for the purposes of this Code is the Company's Chief Human Resources Officer. In addition to fielding questions or concerns with respect to potential violations of this Code, the Compliance Officer is responsible for:

- investigating possible violations of this Code;
- training new employees in Code policies;
- conducting annual training sessions for certain employees to refresh such employees' familiarity with this Code;
- updating this Code as needed and alerting employees to any updates, with appropriate approval of the Committee to reflect changes in the law, the Company operations and in recognized best practices, and to reflect the Company experience; and otherwise promoting an atmosphere of responsible and ethical conduct.

Your most immediate resource for any matter related to this Code is your supervisor. Your supervisor may have the information you need or may be able to refer the question to another appropriate source. There may, however, be times when you prefer not to go to your supervisor. In these instances, you should feel free to discuss your concern with the Compliance Officer. If you are uncomfortable speaking with

the Compliance Officer, please contact the Company's Chief Financial Officer. Of course, if your concern involves potential misconduct by another person and relates to questionable accounting or auditing matters, you may report that violation as set forth in such related policy. You may e-mail anonymously if you prefer, although the Compliance Officer may be unable to obtain follow-up details from you that may be necessary to investigate the matter. Whether you identify yourself or remain anonymous, your email contact will be kept strictly confidential to the extent reasonably possible within the objectives of this Code.

The Compliance Program will have the following minimum features:

A.    All current directors, officers and employees and new hires and appointments will receive and will be required to acknowledge receipt and understanding of this Code, to include all policies referred herein.

B.    While overall managerial oversight responsibility for the Compliance Program will reside in the executive officers of Malibu, Malibu will delegate day-to-day responsibility for the operation of the Compliance Program to the Compliance Officer.

C.    The Compliance Officer will in the first instance be responsible for ensuring compliance with the Code by, among other things, (i) timely documenting, reporting and investigating suspected material violations of the Code that come to their attention; (ii) ensuring the delivery of Code training and (iii) and making recommendations as to the implementation of any modifications and enhancements to any Malibu policy, practice or procedure, including the Code, and to the Compliance Program.

D.    All employees are expected to cooperate fully in internal investigations of misconduct. Neither the reporting employee nor his or her supervisor may conduct any preliminary investigation, unless authorized to do so by the Compliance Officer. The Board, or the Audit Committee, will assess any findings from the investigation the Compliance Officer. The Board, or the Audit Committee, will assess any findings from the investigation changes that need to be made.

E.    Malibu fosters a free and open atmosphere that allows and encourages directors, officers, employees and, agents and others to express work-related concerns about ethical issues and/or to report violations or suspected violations of laws, regulations and Malibu policy. Directors, officers and employees are not only encouraged, but are required, to report any violations of law or of this Code to his or her supervisor or to the Compliance Officer, as appropriate. If an employee believes his or her supervisor has not taken appropriate action, the employee should contact the Compliance Officer directly.

F.    Timely periodic reports will be made to the Audit Committee

about the activities of the Compliance Officer, as well as regarding material violations of the Code.

G. If any investigation indicates that a director, officer or employee has violated this Code or any law or regulation concerning the business of Malibu, such person will be held accountable and may face disciplinary measures up to, and including, termination of employment and, in appropriate cases, civil action or referral for criminal prosecution. Appropriate action may also be taken to deter any future Code violations.

H. Action by family members also may potentially result in ethical issues to the extent that they involve Malibu's business. For example, acceptance of inappropriate gifts by a family member from one of our suppliers could create a conflict of interest and result in a Code violation attributable to you. Employees should consider not only their own conduct, but also that of their family members.

I. To encourage timely reporting, an employee hotline has been established and is monitored by the Compliance Officer. All employees will be advised of the existence of the employee hotline and their right to report suspected violations of law, and of this Code, even on an anonymous basis. The number of the employee hotline is (855) 400-6002. Whether the employee identifies himself or herself or remains anonymous, his or her call with the hotline will be kept strictly confidential to the extent reasonably possible within the objectives of the Code.

If you encounter a situation or are considering a course of action and its appropriateness is unclear, discuss the matter promptly with your supervisor or the Compliance Officer; even the appearance of impropriety can be very damaging and should be avoided.

Malibu will not tolerate retaliation for reports made in good faith and provides full protection for those reporting violations. Anyone who retaliates or attempts to retaliate against a reporting employee will be subject to discipline, up to and including termination. Directors, officers and employees are expected to cooperate in internal investigations of misconduct. Any director, officer and employee may submit a good faith concern regarding questionable accounting or auditing matters without fear of dismissal or retaliation of any kind.

## THE AUDIT COMMITTEE CHARTER

45. In addition to these duties set forth in the Code of Conduct, defendants Buch, Chhina, Stokely, and Taylor (the "Audit Committee Defendants"), who served on the Audit Committee during the Relevant Period, owed specific duties to Malibu under the Malibu Boats,

Inc. Charter of the Audit Committee of the Board of Directors (the "Audit Charter").

Specifically, the Audit Charter described the purpose of the Audit Committee as follows:

> The Committee is appointed by the Board to assist the Board in, among other things, overseeing the accounting and financial reporting processes and the audits of the financial statements of the Company and its financial risk management policies and controls and assisting the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting, auditing, internal control and financial reporting practices of the Company. In addition, the Committee is appointed by the Board to assist the Board in overseeing the Company's risk management with respect to data privacy, cybersecurity and information technology risks.

46. The "Responsibilities and Authority" section of the Audit Charter, states, in relevant part, that the Audit Committee shall have the following responsibilities, among others:

> ***Annual and Quarterly Results***. Review the Company's audited financial statements and quarterly financial results, including the related disclosures required by generally accepted accounting principles in the United States ("GAAP") and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and discuss them with management and the independent auditors. These discussions shall include any significant changes to the Company's accounting principles, the matters required to be discussed under the requirements of the PCAOB, the consideration of the quality of the Company's accounting principles as applied in its financial reporting, including a review of particularly sensitive accounting estimates, reserves and accruals, judgmental areas, audit adjustments (whether or not recorded), the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the financial statements of the Company, the Company's implementation process for any new accounting standards and other such inquiries as the Committee or the independent auditors shall deem appropriate as required to be communicated by the independent auditors to the Committee with respect to the review or audit of the Company's financial statements pursuant to applicable auditing standards adopted by the PCAOB. Based on such review, the Committee shall make its recommendation to the Board as to the inclusion of the Company's audited financial statements in the Company's Annual Report on Form 10-K. The Committee shall review and resolve any disagreements among management and the independent auditors or the internal auditing department in connection with the preparation of the audited financial statements or the quarterly financial statements.

> ***Proxy Report***. Issue annually a report of the Committee to be included in the Company's proxy statement as required by the rules and regulations of the SEC.

* * *

***Press Releases***. Review and discuss with management, prior to release, the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP financial information, as well as financial information and earnings guidance provided to analysts or rating agencies.

* * *

***Other Financial Disclosures***. Discuss with a representative of management and the independent auditors: (i) the interim financial information contained in the Company's Quarterly Report on Form 10-Q prior to its filing; (ii) the earnings announcement prior to its release (if practicable); and (iii) the results of the review of such information by the independent auditors. These discussions may be held with the Committee as a whole or with the Chair in person or by telephone.

* * *

***Internal Control Over Financial Reporting***. Discuss and review with management, the internal auditors and the independent auditors, in connection with each annual or quarterly report filed with the SEC, the quality and effectiveness of and compliance with the Company's internal control over financial reporting, whether prior recommendations concerning internal controls made by the independent auditors have been implemented by management, and the adequacy of any disclosures about changes in internal control over financial reporting. This should include a discussion of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting and any fraud, whether or not material, that includes management or other employees who have a significant role in the Company's internal control over financial reporting. On an annual basis, obtain a written report from management that describes management's own assessment of the effectiveness of such internal control over financial reporting and review the independent auditors' attestation of management's report prior to the filing of the Company's annual report on Form 10¬K.

* * *

***Review of Financial and Accounting Practices***. Review with the independent auditors and management the extent to which changes or improvements in financial or accounting practices suggested by the auditors, as approved by the Committee, have been implemented. This review should be conducted at an appropriate time subsequent to implementation of changes or improvements, as decided by the Committee.

* * *

***Fraud and Regulatory Noncompliance***. Review all reports concerning any fraud or significant regulatory noncompliance that occur at the Company. This review should include, at a minimum, consideration of the Company's internal control over financial reporting that should be strengthened to reduce the risk of a similar event in the future and the impact on previously issued financial statements and reports filed with governmental authorities.

***Significant Judgments***. Meet separately with each of management and the independent auditors regarding any significant judgments made in management's preparation of the Company's financial statements and the view of each as to appropriateness of such judgments, and review analyses prepared by management or the independent auditors setting forth any significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including with respect to alternative treatments of financial information within GAAP that have been discussed with management, the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors.

***Proxy Disclosures***. Cooperate with management, the Board and the Company's legal counsel to ensure that the Company discloses in its proxy statement for its annual meeting of stockholders whether the Committee members are independent as described in this Charter and as defined by the applicable rules and regulations of the SEC and the applicable Nasdaq rules, as well as certain information regarding any director of the Committee who is not independent. Risk Assessment and Management. Discuss with management and the independent and internal auditors the Company's major financial risk exposure and the steps management and the independent and internal auditors have taken to monitor and control such exposure, including the Company's risk assessment and risk management policies.

\* \* \*

***Other Matters***. Oversee and consider any other audit or financial statement related matters that may arise from time to time and develop appropriate recommendations for the Board.

## V.    FACTUAL BACKGROUND

### A.    <u>Company Overview</u>

47.     Malibu, a Delaware corporation headquartered in Loudon, Tennessee, designs, manufactures, and markets sport boats. The Company produces sport boats used for water sports including water skiing, wakeboarding, and wake surfing, as well as for general recreational boating use.

48.     Malibu's products belong to three separate business segments – Malibu, Saltwater Fishing, and Cobalt. The largest of the three segments is the Malibu segment (the "Malibu Segment"), comprised of freshwater performance sport boats, which accounted for more than

half of the Company's total revenue. Indeed, throughout the Relevant Period, the Individual Defendants boasted of Malibu holding the "number one market share position in the United States for performance sport boats with our [Malibu Segment]." The Malibu Segment sells under two brand names: Malibu, which is the Company's flagship brand and offers premium sport boats with luxury features ("Malibu Brand"); and Axis, which is marketed as a more affordable line of performance sport boats and targets a younger, entry-level boat owner demographic.

49. The Company sells boats via a network of independent dealers, including dealers operating under the common control of Tommy's. In FY 2023, sales to Tommy's dealers represented approximately 23.3% of consolidated sales for Malibu brand boats and approximately 10.7% of the Company's consolidated net sales.

50. According to the Company's SEC filings, Malibu recognizes revenue when "control of promised goods (boats, parts, or other) is transferred to the customer." As "[d]ealers generally have no right to return unsold boats," Malibu recognizes revenue upon the delivery of the boats to the dealer, regardless of whether boats are ultimately sold to an end user.

**B.    <u>The Tommy's Action Reveals the Individual Defendants' Scheme</u>**

51. On April 10, 2024, Tommy's and its various subsidiaries filed the Tommy's Action against the Company in the Eastern District of Tennessee, accusing Malibu of breach of contract, unjust enrichment, fraud, and negligent misrepresentation, among other claims. The Tommy's Action alleged that defendant Springer and Malibu's management knew that the Company's 2023 sales would be 50% lower than 2022 sales and decided to take steps to shift the anticipated loss to Tommy's dealerships.

52. First, defendant Springer caused Malibu to coerce Tommy's into increasing its available floor plan financing from $50 million to $160 million by telling Tommy's that it should

maintain 25 weeks of inventory in stock at the turn of the model year based on Malibu's market analysis. As detailed in Tommy's sworn, verified litigation filings, including a sworn declaration of Tommy's President and owner, Matthew Borisch ("Borisch"), filed in federal bankruptcy court, the defendants to the Tommy's Action proceeded to "pump Tommy's full of boats" despite having "full knowledge" that Tommy's did not want or need the additional inventory, as "the market analysis did not warrant such inventory levels."

53.     The Tommy's Action alleges that in July 2022, defendants Springer and Wilson invited Borisch (who was based in Michigan) and his director of operations, Ed Wells, to a lunch meeting in Tennessee. During this meeting, defendants Springer and Wilson "began pressuring Mr. Borisch to commit to increasing [Tommy's] existing floor plan credit capacity" so that Tommy's could purchase more boats from Malibu. When "Mr. Borisch pushed back, both in the initial meeting [in July 2022] and over the months that followed, Malibu made clear that its request was not optional, and that Mr. Borisch would lose his status as a Malibu dealer if he did not comply." Additionally, Tommy's had earned significant financial incentives during FY 2022, which Malibu had not yet paid. These incentives were purposefully withheld as further leverage to push Tommy's into increasing its floor plan financing capacity—while continuing to make clear that the Tommy's Action defendants "would retaliate if [Tommy's] did not comply with their demands."

54.     Then, according to the Tommy's Action, in late 2022—at the same time that industry sources were expecting boat demand to dramatically decline—the Officer Defendants suddenly told Tommy's that it was required to have a minimum of 25 weeks of Malibu Segment inventory on hand, purportedly based on Malibu's own internal retail demand forecasts for FY 2023. At the time, Tommy's had only used approximately $30 million of its $50 million credit

facility for floor plan financing with its lender, Fifth Third Bank, with $20 million of additional capacity remaining. To have 25 weeks of inventory on hand, Tommy's would be forced to increase its current floor plan capacity by more than a factor of five. Borisch detailed in court filings in the Tommy's Action how, to ensure Tommy's would comply, on or about "December 16, 2022, [Defendant] Wilson called Mr. Borisch's primary point of contact with [Fifth Third] bank, Rick Budinger, and demanded that the bank immediately fund the boats that Malibu had shipped or else 'bad things would happen.'" Facing significant financial pressure due to the Officer Defendants' ongoing threats and manipulations, Tommy's agreed to Malibu's demands, extending its credit facility with Fifth Third Bank by 70%, from $50 million to $85 million.

55.    Malibu filled Tommy's showrooms with Malibu's most expensive, highest margin boats, which took the longest periods of time to sell. Tommy's had requested that Malibu send it Malibu's lower price point boats, which historically sold at a quicker pace.

56.    The Individual Defendants caused Malibu to snub the request because the Company recognizes a sale when the dealer takes delivery of the boat, regardless of whether it has been sold to the end user. As a result, this scheme, known as "channel-stuffing", enabled the Company to report that it experienced strong wholesale demand and sales, even as sales to the end user declined.

57.    This channel-stuffing scheme through the beholden Tommy's took on even more urgency in early 2023. At that time, Malibu's largest dealer, OneWater Marine, Inc. ("OneWater"), unexpectedly cancelled a significant amount of Malibu boat orders for the year, citing its own assessment of a sharp downturn in demand for Malibu boats across its roughly 100 dealerships.

58.    Unlike Tommy's, OneWater was not reliant on Malibu, as it was a much larger

company that sold boats from a wide variety of manufacturers. OneWater's CEO delivered the news of its cancellations directly to defendant Springer in a personal meeting in early 2023. With OneWater accounting for as much as 17% of Malibu's sales, the cancellations were disastrous for Malibu's business.

59.     Indeed, CW 1,[2] a former OneWater Senior Sales Executive,[3] stated that OneWater became aware of the market downturn beginning in early 2023. OneWater had forecasted that there would be a continual downturn in Malibu retail boat sales as a result, causing its CEO, Austin Singleton ("Singleton"), to hold a meeting with defendant Springer in early 2023. During this meeting, Singleton cancelled a significant amount of OneWater's Malibu boat orders for FY 2023. As CW 1 noted, OneWater cancelled these orders because "the COVID years were done."

60.     A former Malibu employee likewise confirmed that Malibu's own internal market data showed that, beginning in early 2023, there was a sharp drop-off in retail demand for Malibu boats. CW 2[4] explained that his work included collecting retail boat registration and customer survey data for Malibu's boats that had been sold to consumers from a program called Qualtrics. He would then create reports on trends within that data which he provided to his

---

[2]     The operative complaint in the Securities Class Action (the "Securities Complaint") is based on confidential accounts from witnesses described therein as current or former employees of Malibu, OneWater, and Tommy's, noted as Confidential Witnesses ("CWs") and identified by number (CW 1, CW 2, etc.). The Securities Complaint notes that the CWs are all referred to in the masculine form to maintain their confidentiality.

[3]     According to the Securities Complaint, CW 1 worked as a Senior Sales Executive for OneWater's Georgia dealership from June 2020 until June 2024.

[4]     According to the Securities Complaint, CW 2 worked as a former Data and Analytics Specialist within the Company's Market Research department from December 2021 through January 2024. As a Data and Analytics Specialist during this period, CW 2 reported directly to Malibu's Digital Marketing Manager, Kendall Getley, who in turn, reported to the Vice President of Marketing, Doreen Bayliff.

superiors, **as well as to Malibu's CEO and its Board**, on a quarterly, monthly, and sometimes even weekly basis. CW 2 utilized this data to identify how many Malibu boats had been sold to retail consumers in any given period. Since this data provided insight into retail demand levels, CW 2 also provided his reports to Malibu's sales department to assist them in their forecasting efforts.

61.     CW 2 recalled that he noticed a big drop-off in boat registrations beginning around January 2023 and continuing throughout calendar year 2023, up until he left the Company in January 2024. Given that a decline in boat registrations pointed to declining retail demand, CW 2 created reports documenting Malibu's dramatically declining boat registration data and distributed them internally. Regarding these reports, CW 2 explained: "There was a huge concern with the directors and the sales managers. They had a lot of questions about what I was presenting to them." And "whenever I was asked about this the same people would ask the sales department and be told that sales were [indeed] down."

62.     In early 2023, the Individual Defendants caused Malibu to pressure Tommy's to take on even more floor plan capacity, despite the fact that Tommy's lender, Fifth Third Bank, was unable to finance additional sales because Tommy's had already reached its credit limit. Moreover, in March 2023, the Officer Defendants introduced Tommy's to a new lender, M&T Bank, that was willing to provide Tommy's with $110 million in floor plan capacity with a $20 million overlimit—amounting to $130 million total.

63.     Malibu typically entered into agreements known as "repurchase agreements" with its dealers' lenders.  These industry standard agreements provided that Malibu would repurchase unsold inventory from a dealer in the event the dealer defaulted on repaying its lender for the boats.  Malibu did not enter a repurchase agreement with M&T with respect to Tommy's,

standard in Malibu's financing contracts pursuant to its own public filings, and had in fact been present in all of Tommy's prior financing arrangements. The Individual Defendants caused Malibu to take these actions to avoid any risk of blowback from the channel-stuffing scheme despite repurchase agreements being an industry standard.

64.     The Individual Defendants further insisted that the majority of the excess inventory being pushed on Tommy's be comprised primarily of the Company's highest margin Malibu Brand boats, rather than the more even split of Malibu Brand and lower-priced Axis brand boats carried by Tommy's historically. The only purpose of this decision was the short-term increase in Malibu's profits, as Tommy's had requested a greater share of the lower-priced Axis boats due to the economic downturn, but Malibu ignored Tommy's requests and delivered mostly high-priced Malibu Brand boats instead. When Tommy's attempted to push back on the Officer Defendants' demands to take this excess inventory, the Officer Defendants continued to leverage the incentive payments owed to Tommy's that had not yet been paid. Specifically, according to the Tommy's Action, "[Malibu Director of Sales] Scott Davenport, acting on behalf of Malibu, assured Mr. Borisch that Malibu was honoring its agreement to pay the rebates and incentives, and pay for interest recovery, so long as [Tommy's] continued to take on the inventory, as Malibu was demanding."

65.     These allegations were corroborated by CW 3,[5] who recalled that Tommy's

---

[5]     According to the Securities Complaint, CW 3 worked as a Sales Representative for Tommy's Colorado dealership from June 2020 through November 2023 and reported directly for Cassidy Batchel, General Manager of Tommy's Boats in Colorado. As a Sales Representative for Tommy's, CW 3 had first-hand experience with the fluctuations in retail demand during and after the COVID-19 pandemic, and was responsible for reporting registration information concerning his boat sales to Malibu on a frequent and consistent basis. CW 3 left Tommy's voluntarily in November 2023 because selling boats was no longer as lucrative as it was when he first started working for Tommy's in June 2020.

Colorado dealership suddenly and dramatically increased its lot size by 50% in the summer of 2022 to accommodate large numbers of additional Malibu Segment boats that would soon be delivered. According to CW 3, Tommy's Colorado had a lot that could store approximately 100 boats in inventory which was adequate, but, in the summer of 2022, Tommy's Colorado dealership then purchased another lot to increase its capacity to 150. As Borisch himself has stated, Tommy's took these steps to expand its dealerships' floor plan capacity due to the constant pressure and threats from Malibu and the Officer Defendants.

66.     CW 3 also noted that his Colorado dealership generally ordered a 50-50 split of Malibu Brand boat and Axis brand boats each year, and Malibu would produce and ship boats to Tommy's Colorado dealership according to that split. However, this changed when the dealership placed its boat orders in the fall of 2022 for boats to be shipped during fiscal year 2023. Rather than fill the typical 50-50 order, Malibu instead produced and shipped a 75-25 split in favor of the higher-end Malibu Brand boats throughout fiscal year 2023.

67.     Further, despite the positive public statements and unbeknownst to stockholders, by the summer of 2023, Tommy's bloated inventory levels had begun to cause it to spiral into increasing financial distress. The Individual Defendants, however, continued to pressure Tommy's to continue to take on increasing inventory that the Individual Defendants knew was not needed or wanted, and that the Individual Defendants knew there was no market for, as the retail demand market continued to deteriorate.

68.     Despite the Individual Defendants' public claims of continuing robust demand for Malibu's "feature-rich boats," as of June 12, 2023, Tommy's still had 800 of the 1,190 Malibu Segment boats it had purchased in 2023 remaining in its inventory, or nearly 70% of the previous year's boats—a fact the Officer Defendants were well aware of given that they had near real time

access to Tommy's retail sales and inventory levels, and received updates on those metrics on a weekly basis. Specifically, CW 3 was involved in entering sales data in Malibu's customer relationship management ("CRM") portal in order to "register the sale" in Malibu's sales tracking system, which Malibu used to determine whether Tommy's was entitled to financial incentives under the dealership agreements.

69.     With this stagnant inventory with Tommy's, the Individual Defendants still demanded that Tommy's commit to ordering 1,160 Malibu Segment boats in FY 2024 before Malibu would agree to execute new dealership agreements with Tommy's for the upcoming year. Despite 800 boats of excess inventory still on hand, and in the midst of declining retail demand and rising interest rates for carrying that inventory, Tommy's countered with an offer to commit to ordering only 559 boats—approximately 50% fewer boats than the total number of Malibu boats Tommy's had purchased during FY 2023—but the Officer Defendants refused to agree.

70.     CW 3 stated that these facts were consistent with his experience at Tommy's Colorado dealership during the same timeframe as retail sales had declined substantially during FY 2023 and the Colorado dealership still had between 25 and 50 Malibu boats in its inventory. According to CW 3, given all of the sales and inventory data Tommy's was required to input into Malibu's online portal, "there was no way Malibu did not know [Tommy's] sales were slowing in real time." Despite this, Malibu still pushed for Tommy's Colorado dealership to order at least 100 additional boats for FY 2024. Further, CW 3 recalled Tommy's executive management tried to accommodate Malibu's request even with the excess inventory so that Malibu would finally execute FY 2024 dealership agreements with Tommy's. CW 3 further noted: "There seemed to be a sense of urgency in moving boats, but the number of boats [Malibu] was sending they [i.e., the Colorado dealership] were not comfortable accepting."

71.     Moreover, according to CW 3, at the same time, "many dealerships [other than Tommy's] were holding off on placing and receiving model year 2024 orders" because "everyone [still] had 2022 and 2023 excess Malibu inventory." CW 3 further noted that other Malibu authorized boat dealers, including Taylor's Boats with locations in multiple states, in addition to "another Malibu dealership in Coeur d'Alene, Idaho," also were pushing back on Malibu and holding off their Malibu boat orders.

72.     In the summer of 2023, Tommy's continued to relay to Malibu that it was unable to take on the 1,160 boats Malibu that it was demanding Tommy's purchase due to declining demand and a lack of sales. Additionally, CW 3 noted that in June-July 2023, his personal number of Malibu Segment sales had gone from five boats per month down to only one or two boats per month. While Malibu eventually lowered its required commitment down to 605 boats, Tommy's was already quickly "nearing danger with respect to [its] current inventory due to the unreasonable number of Malibu boats that Malibu had forced upon [Tommy's]"—and "[b]y August 2023, [Tommy's] dealerships were in a dire financial position." In August 2023, Tommy's sold a number of boats from its inventory, in an effort to cover its costs and avoid insolvency. Tommy's made these sales without remitting the necessary portion of those sales proceeds to M&T Bank, a significant default event referred to in the marine industry as "sales out of trust," or "SOT"—an event that had never previously occurred in Tommy's entire 12-year relationship with Malibu.

73.     According to the Securities Complaint, Tommy's immediately notified Malibu of its SOT status, by no later than September 2, 2023. The next day, September 3, 2023, Tommy's reached out to Malibu for assistance in right-sizing its overstocked inventories, and also sought payment of outstanding financial incentives and monetary advances from Malibu which

Tommy's claimed it could use to cure its default with M&T. However, the Officer Defendants refused to pay any of the outstanding financial incentives, asserting that Tommy's was not eligible to receive them. Malibu and defendant Springer further made clear to Tommy's that Malibu would not enter into any repurchase agreement to buy back excess inventory due to Tommy's worsening financial state.

74.     According to the Securities Complaint, once Tommy's reported its SOT status to Malibu, defendant Springer informed Tommy's that it would not enter into any new dealership agreements with Tommy's—meaning virtually no dealership agreements existed anymore between the parties. Indeed, nearly all of the prior dealership agreements for Tommy's fifteen dealerships had already expired as of June 30, 2023. situation on Malibu's business. Defendant Springer himself made clear that he fully understood the implications of Tommy's dire financial situation on Malibu's business. Indeed, on September 11, 2023, defendant Springer sent an email directly to Borisch, which stated: "Tommy's is SOT, which is one of the worst situations that can arise. Until Tommy's is in good standing with M&T, no dealer agreement can or will be signed."

75.     Despite the fact that the Individual Defendants knew full well that Tommy's, Malibu's single most important dealer, was rapidly approaching insolvency as a result of the channel stuffing scheme, the Individual Defendants did not disclose this material information to stockholders. Even with this knowledge, defendant Springer continued attempting to exploit Malibu's leverage over Tommy's, seeking Tommy's to take on an additional 131 boats.

76.     The Individual Defendants' decision to dump higher priced and harder to sell models on Tommy's made it nearly impossible for the distributor to hit its sales targets and saddled it with high interest debt. The Individual Defendants exacerbated Tommy's problems when they caused Malibu to renege on making payments and refusing to repurchase the

inventory. According to the Tommy's Action, three highly placed Malibu stakeholders told Borisch that defendant Springer intentionally pumped Tommy's full of inventory in order to inflate Malibu's sales and market share, according to allegations in the Tommy's Action. They also reported that defendant Springer "would not turn the spigot off." These principals further informed Borisch that the Company's CFO left on "bad terms" and that "Jack is not going to last." Despite these high-ranking executives at Malibu knowing that defendant Springer was engaging in accounting chicanery, they still took no steps to stop the scheme.

77.    Even with the negative outlook for boat sales in 2023, the general sales decline in the industry, and Malibu's actions towards Tommy's, the Individual Defendants caused the Company to continue to tout positive sales performance and increased market share during the period.

78.    Under the Individual Defendants' direction, Malibu kept the "spigot" on and reported increased sales by dumping its excess inventory. The Individual Defendants made the situation even more grave by declining to enter into a repo agreement, which Malibu had done in prior years, despite insisting that Tommy's increase its floor space.

79.    On January 30, 2024 – only a few months after the Individual Defendants had repeatedly touted consumer demand for Malibu Segment boats and the Company's focus on maintaining dealer health and proper inventory levels – the Company released poor financial results. Malibu reported that consolidated net sales had decreased 37.7% to $211 million, unit volume had decreased 43.7% to 1,373 units, net income had decreased 72% to $10 million, and Adjusted EBITDA had decreased 60% to $23 million. Malibu Segment sales were especially poor, having declined 51.7% versus the same quarter a year earlier to just $76.4 million—a far larger decline than Malibu's other segments, which was especially striking given Defendants'

repeated reassurances that the Malibu Segment's "premium buyers" were unimpacted by economic trends and would continue to carry Malibu's sales through a downturn.

80. Further, the Individual Defendants also dramatically lowered Malibu's full FY 2024 guidance. Specifically, while three months earlier the Individual Defendants had forecasted for FY 2024 a "net sales decline percentage in the high teens to low twenties year-over-year and Adjusted EBITDA margin down 350-450 basis points year-over-year," the Individual Defendants now gave guidance that nearly doubled those declines, forecasting a "net sales decline ranging from the mid-to-high thirties percentage, year-over-year, and Adjusted EBITDA margin down 800 to 900 basis points, year-over year."

81. Significantly, during Malibu's earnings conference call the same day, defendant Springer admitted that "channel inventories [were] higher than we, or our dealers would like to see"—and, specifically, that Malibu dealers had "around 5 weeks too much on hand inventory," requiring Malibu to "take an aggressive approach" to lower production levels. Indeed, when an analyst asked why the "implied EBITDA margin" was lower than it had been in over a decade and what was the reason for the "magnitude of the change," defendant Springer admitted that Malibu had been forced to "significantly" reduce its production due to too high inventory levels.

82. On this news, Malibu's stock price fell nearly *20%* in a single day—or $9.47 per share, from a close of $51.03 per share on January 29, 2024, to a close of $41.56 per share on January 30, 2024.

83. However, the Individual Defendants also assured stockholders that the Company's slowdown was temporary and solely due to market forces, that the Company's "premium" brands were well positioned to succeed even in a weaker boat market, and that the Company remained tightly focused on setting appropriate inventory levels. For example, during

the same January 30, 2024 earnings call, defendant Springer explained that the Company was "recalibrating to match wholesale production to retail demand," was "very, very committed to reducing channel inventory to lower levels," and further characterized its approach to inventory levels as "conservative." And in direct response to analyst questions about inventory levels, defendant Springer asserted that Malibu was "being very responsible with channel inventories and that's what we're hearing [from] our dealers."

84.     Defendant Springer also touted "positive signs following our year-end sales" with "Malibu Axis performing better than we had expected," and with "[a]ll brands [] at the higher end of sales compared to the previous 5 years" at the recent New York boat show. Indeed, defendant Springer continued to claim that Malibu was seeing strong demand in the "premium segment," i.e., from buyers who were financially well off and thus able to pay cash and unaffected by interest rates—explaining that "[o]ur customer segment that has remained strong [is] the premium segment, cash buyers who are looking for the larger, [feature] rich premium boat

85.     By late February 2024, Tommy's could no longer manage the ongoing financial burden of its bloated inventories, and Malibu could thus no longer benefit from the Officer Defendants' scheme. Accordingly, on February 26, 2024, defendant Springer notified Tommy's that Malibu would not enter into dealership agreements with Tommy's for FY 2024. The next day, on February 27, 2024, Tommy's was forced into default on its financing agreement with M&T Bank—owing amounts in excess of $110 million from its coerced purchases of excess Malibu Segment inventory.

86.     Despite these developments, even as late as March 5, 2024, defendant Springer emphasized how closely Malibu was supposedly monitoring its dealer network, without making

any mention of the fact that Tommy's, its second largest dealer and largest Malibu Segment dealer, no longer had dealership agreements in place or credit available to purchase Malibu boats. Specifically, at a Raymond James investor conference that day, defendant Springer emphasized that "[w]e're talking about dealers that may be stressed or somewhat, but at the same time we're following that. We want to know what the dealer health is and we actually have a report card on that."

87. On April 10, 2024, Tommy's filed the Tommy's Action against Malibu and its subsidiaries in the Eastern District of Tennessee alleging that Malibu "breached its obligations under dealership agreements with Tommy's Boats, quantum meruit, unjust enrichment, promissory estoppel and intentional and negligent misrepresentations relating to the parties' commercial relationship." Significantly, the complaint alleged that Malibu had "engaged in an elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen (15) Tommy's dealerships … in order to artificially inflate Malibu's sales performance, artificially claim increased market share in the industry and artificially inflate its stock value during an obvious and known downturn in the recreational power boat industry." It also revealed that defendant Springer had directly enacted and overseen the scheme—and that defendant Springer's abrupt departure was likely directly linked to his involvement in the scheme.

88. The filing of the Tommy's Action finally forced the Individual Defendants to make a disclosure. The following day, on April 11, 2024 after market close, the Individual Defendants caused Malibu to file a Current Report on Form 8-K with the SEC revealing the filing of the Tommy's Action. The Form 8-K further revealed, for the first time, that the Company had not only terminated its relationship with Tommy's—the largest dealer of its

Malibu Segment brands, accounting for more than 20% of those sales the prior fiscal year—but admitted that the Company needed to find, and was actively seeking, replacement dealers in order to avoid what the Individual Defendants called "marketplace disruption."

89.     Further, the Form 8-K noted that "[t]he Company does not currently have dealership agreements in effect with Tommy's Boats," and that "[t]he Company is actively engaged with its dealer network to mitigate any marketplace disruption and to provide a strong dealer partner in each of the Company's markets served by Tommy's Boats." On this news, the Company's stock price fell by $3.34, or 8%, from a close of $41.82 per share on April 11, 2024 to close at $38.48 per share on April 12, 2024.

90.     Raymond James issued a report before market open on April 12, 2024 summarizing that the Tommy's Action had alleged that Malibu and defendant Springer had enacted "a scheme to artificially inflate [Malibu's] financial results, market share, and stock price by excessively shipping higher priced, higher margin, and slower moving Malibu boats at a time when demand was slowing; refusing to pay millions of dollars in earned dealer incentives; and failing to put into place an inventory repurchase agreement with Tommy's floor plan lender, M&T Bank." The Raymond James report stated that, given that Malibu had "end[ed] its relationship with Tommy's after 12 years," Malibu faced the problem that "the inventory owned by Tommy's needs to find a home with other dealers.

91.     The subsequent trading day, on April 15, 2024, Raymond James issued a more detailed report titled "Downgrading to Market Perform, as Headwinds and Uncertainties Continue to Mount." Raymond James stated that "this shift to a neutral stance is in response to the loss of Tommy's Boats, one of MBUU's largest dealers (10.7% of total sales/23.3% of Malibu segment sales in FY23) which last week filed [the Tommy's complaint]." Raymond

James noted that the Tommy's Action would "likely remain an overhang on the stock," and that, moreover, regardless of the outcome a "significant issue in our view is the impact of Tommy's inventory being absorbed into the dealer channel on MBUU's sales and margins, the implications of which we fear could extend into FY25."

92.     Additionally, Raymond James stated that an estimated $110 million of Tommy's inventory of Malibu Segment boats "needs to find a home," and that "how this inventory ultimately gets absorbed into [Malibu's] dealer network" was a significant issue for Malibu's sales, especially since other Malibu dealers "are already looking to reduce inventory given the current soft demand environment and will likely only do so at a steep discount." As Raymond James noted, Malibu would likely "feel the impact" and potentially "share in the loss" as what inventory could be moved would be sold for pennies on the dollar, and as Malibu would likely have to provide costly "discounts and dealer incentives" to get other dealers to sell the boats.

93.     In further reaction to the news regarding Tommy's and the Raymond James downgrade, Malibu's common stock price continued to decline sharply, falling another $2.34, or 6%, to close at $36.14 per share on April 15, 2024.

94.     On May 2, 2024, the Individual Defendants released financial results for the third quarter of FY 2024 that again fell short of expectations, causing guidance to be slashed for the third quarter in a row. Specifically, Malibu's net sales fell 46% from the prior quarter to just $203.4 million—driven largely by a 65% decline in Malibu Segment sales—and Adjusted EBITDA plummeted nearly 70% to just $24.4 million, and Individual Defendants now forecasted that consolidated net sales for FY 2024 would be down more than 40% from the prior year.

95.     On this news, Malibu's stock price fell another 4%—or $1.27 per share—on

unusually high volume, from a close of $33.06 per share on May 1, 2024, to a close of $31.79 per share on May 2, 2024.

96.  On May 20, 2024, Tommy's filed for Chapter 11 bankruptcy protection.

97.  The Tommy's Action was resolved when Malibu eventually agreed to pay Tommy's $3.5 million and Malibu agreed to drop its $9.6 million claim against Tommy's, after negotiations took place including a mediation in the bankruptcy.

**C.     The Channel Stuffing Scheme Ensured Inflated Incentive Compensation for Defendant Springer**

98.  The Officer Defendants were motivated to perpetrate the channel stuffing scheme so that the Company could meet revenue targets and they could selfishly earn maximum bonus compensation for themselves. Further, under the Company's compensation policy, defendant Springer was eligible for substantial cash bonuses equal to or greater than his entire salary if Malibu met certain specified targets for net income and Adjusted EBITDA.[6]

99.  Defendant Springer's base salary was set at $875,000 for FY 2023. However, if Malibu met or exceeded a net income threshold of $179.8 million and an Adjusted EBITDA threshold of $275.7 million for the year, defendant Springer would be eligible for an additional cash bonus equal to his base salary, thus doubling his compensation to $1.75 million. Defendant Springer would be eligible to receive an even larger bonus by exceeding that target.

100.  Moreover, although the compensation plan provided for lower bonus levels if Malibu did not reach the specified net income and Adjusted EBITDA, those levels were a

---

[6]     Defendants Wilson, Black, and Beckman potentially would have been eligible to benefit from the scheme in a similar manner, but the timing of their employment ultimately did not allow for it. Specifically, defendant Wilson left the Company before the end of FY 2023, defendant Black only served as CFO for a small portion of FY 2023, and defendant Beckman was CFO during only part of FY 2024.

fraction of the amount that defendant Springer would receive if the Company met or exceeded those targets. If the Company achieved anything less than 90% of the specified net income and Adjusted EBITDA targets, then defendant Springer would not be eligible for any cash bonus. Indeed, if the Company's financial results fell somewhere between 90% and 100% of the targets, defendant Springer stood to lose over half a million dollars. Thus, at 90% of the targets, Springer would be awarded just 35% of his maximum bonus amount – $306,250 – instead of the full $875,000 award to which he would be entitled if Malibu reached 100% of the specified targets. Thus, defendant Springer was highly motivated to ensure that Malibu booked enough sales during the Relevant Period in order to meet or exceed the full amount of the compensation plan's specified targets.

101. Tellingly, in FY 2023—the year during which the inventory scheme was at its peak— Malibu achieved net income (excluding litigation expense) of $184.2 million, exceeding the target of $179.8 million by just $4.4 million, or a mere 2%. Similarly, the Company achieved Adjusted EBITDA of $284 million, a mere 3%, or $8.3 million, above its target of $275.7 million. Strikingly, the Officer Defendants pumped a massive $50 million in excess inventory into the Tommy's channel in May and June 2023 alone—the final few weeks before the end of FY 2023, and at a time when the Officer Defendants assuredly knew exactly how much in sales was necessary for Malibu to meet the predetermined net income and Adjusted EBITDA targets necessary to trigger defendant Springer's bonus. These late sales to Tommy's, which caused Malibu to slightly exceed its targets, rendered defendant Springer eligible to receive a cash bonus of $962,500—more than doubling his total cash compensation to $1.83 million for the year.

102. Further, given that Malibu met the specified financial targets by just a few million dollars, without the Officer Defendants' channel-stuffing scheme, Malibu would not have

achieved anything close to the targets necessary for defendant Springer to obtain any bonus at all. Thus, the Officer Defendants had a strong personal financial motive to orchestrate and implement their illicit scheme.

### D.   The Securities Class Action

103.   The Securities Class Action was initiated on behalf of a class of Malibu investors in the Southern District of New York on April 29, 2024.

104.   On October 4, 2024, the lead plaintiffs to the Securities Class Action filed the operative Securities Complaint against the Company and defendants Springer, Beckman, Black, and Wilson, asserting claims for violations of the federal securities laws and seeking damages on behalf of a class of persons or entities who bought or otherwise acquired Malibu common stock during the "Class Period" of November 4, 2022 through May 1, 2024.   As alleged herein, the allegations in the Securities Complaint are based in substantial part on the detailed CW accounts.

### E.   The Materially False and Misleading 2023 Proxy Statement

105.   Also on September 15, 2023, the Individual Defendants caused the Company to file an Annual Proxy Statement on Schedule 14A with the SEC (the "2023 Proxy").

106.   The 2023 Proxy recommended that shareholders vote to elect defendants Chhina, Connolly, and Lanigan to the Board to serve until the Annual Meeting in 2026, and approve the compensation of certain of the Company's executive officers. It also recommended that shareholders vote to ratify KPMG as the Company's independent registered public accounting firm for the FY ending June 30, 2024.

107.   The 2023 Proxy also stated the following regarding the Board's role in risk oversight at the Company:

> The Board believes that effective risk management involves our entire corporate governance framework. Both management and the Board have key

responsibilities in managing risk throughout the Company, as shown below. Oversight of risks inherent in their respective areas of oversight are delegated to the various Board committees. At each regular meeting of the Board, the chairperson of each committee reports to the full Board regarding the matters reported and discussed at any committee meetings, including any matters relating to risk assessment or risk management. Our Chief Executive Officer, Interim Chief Financial Officer and outside legal counsel regularly attend meetings of these committees when they are not in executive session, and often report on matters that may not be otherwise addressed at these meetings. In addition, our directors are encouraged to communicate directly with members of management regarding matters of interest, including matters related to risk, at times when meetings are not being held. The Board believes that the processes it has established for overseeing risk would be effective under a variety of leadership frameworks and therefore do not materially affect its choice of leadership structure as described under "Board Leadership Structure" above.

108. The 2023 Proxy stated the following regarding the Company's Code of Business

Conduct and Code of Ethics:

The Board has adopted a Code of Conduct applicable to our employees, directors and officers and a Code of Ethics. The Code of Ethics applies to our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions. The codes are available on the Corporate Governance section of our website at investors.malibuboats.com/corporate-governance. To the extent required by rules adopted by the SEC or Nasdaq, we intend to promptly disclose future amendments to certain provisions of the codes, or waivers of such provisions granted to executive officers and directors on our website at www.malibuboats.com.

109. The 2023 Proxy stated the following regarding the Company's Clawback Policy:

In fiscal 2022, the Board adopted a new clawback policy that permits us to clawback or recover cash and equity incentive compensation in the event of a material restatement of our financial statements or if a covered executive commits fraud during the course of employment that causes financial or reputational harm to us. In the event of a material restatement of our financial statements, the clawback would apply to any amount awarded after September 15, 2021 and paid in the three-year period preceding the restatement that would not have been received if the financial statements had been correctly stated. In the event a covered executive commits fraud, all cash and equity compensation awarded after September 15, 2021 is subject to clawback. All of the currently employed Named Executive Officers are subject to the clawback policy. This clawback policy will be amended to comply with the new SEC and Nasdaq rules, and we intend to retain the flexibility to clawback compensation in the event a covered executive

commits fraud, even though this clawback right is broader than required by the new rules.

110.     Defendants Springer, Buch, Chhina, Connolly, Hooks, Lanigan, Lewis, Murphy, and Stokely caused the 2023 Proxy to be false and misleading by failing to disclose that (1) the risk oversight functions of the Board and its committees were not being performed as described, as evidenced by the occurrence of the Individual Defendants' wrongdoing alleged herein, which involved members of the Board; and (2) although the 2023 Proxy claimed the Company's Code of Conduct applied to the Company's officers and directors, the Individual Defendants violated the Code of Conduct with no consequences.

111.     Defendants Springer, Buch, Chhina, Connolly, Hooks, Lanigan, Lewis, Murphy, and Stokely further caused the 2023 Proxy to be false and misleading by failing to disclose that: (1) Malibu engaged in an "elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen Tommy's dealerships"; (2) the Company artificially inflated Malibu's sales performance, market share, and stock value; (3) the Company was withholding certain incentives and rebates from its dealers; (4) the Company faced substantial risk of litigation from one of its top dealers, Tommy's; (5) the Company's CEO departed due to his role in this scheme; and (6) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

112.     As a result of the Individual Defendants' false and misleading statements in the 2023 Proxy, the Company's stockholders made uninformed decisions when voting to re-elect the above Individual Defendants as proposed in the 2023 Proxy.

**F.     Insider Selling**

113.     Before the full disclosure by Malibu of the omitted material information discussed

herein, defendants Springer and Anderson sold 45,833 shares of Malibu common stock for collective proceeds of approximately $2.5 million while in possession of MNPI.

114. Defendant Springer sold 25,000 Malibu shares, while the price of the Company's stock was artificially inflated for approximately $1,501,402 in proceeds while in possession of MNPI. As CEO, defendant Springer knew the truth about (1) the scheme to dump high priced, high margin, slow moving inventory into Tommy's dealerships; (2) the resulting liability risk; (3) his own involvement in the scheme; and (4) that, as a result, the Company's sales performance, market share, and stock value were artificially inflated.

115. Defendant Anderson sold 20,833 Malibu shares, while the price of the Company's stock was artificially inflated for approximately $1,052,388 in proceeds while in possession of MNPI. As COO, defendant Anderson knew the truth about (1) the scheme to dump high priced, high margin, slow moving inventory into Tommy's dealerships; (2) the resulting liability risk; (3) defendant Springer's involvement; and (4) that, as a result, the Company's sales performance, market share, and stock value were artificially inflated.

## BREACHES OF FIDUCIARY DUTIES

116. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Malibu, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders.

117. The Individual Defendants breached their duties of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the Company's "elaborate scheme to over manufacture and pump nearly $100 million of its highest

priced, highest margin, slow moving boat inventory into fifteen Tommy's dealerships". As a result, the Company's sales performance, market share, and stock value were artificially inflated. The Company was also withholding certain incentives and rebates from its dealers and, because of the foregoing, the Company faced substantial risk of litigation from one of its top dealers, Tommy's. Moreover, the Company's CEO departed due to his own role in this scheme as described herein. The Individual Defendants also breached their duties of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Malibu substantial damage.

118.    The Audit Committee Defendants had a duty per the Audit Charter to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duties of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Malibu's public statements and internal control functions.

119.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Malibu, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Securities Class Action, which alleges violations of federal securities laws and exposes the Company to potentially massive liability. As a result, Malibu has expended, and will continue to expend, significant sums of money.

**DAMAGES TO THE COMPANY**

120. As a direct and proximate result of the Individual Defendants' conduct, Malibu has expended and will continue to expend significant sums of money.

121. Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action of amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

122. As a direct result of the Individual Defendants' conduct, Malibu has suffered and will continue to suffer a loss of reputation and goodwill and a "liar's discount" that will plague the Company's stock price in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

123. Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

124. The Individual Defendants' actions caused severe damages to Malibu, including tens of millions of dollars in potential liability in the Securities Class Action and undeserved remuneration paid to the Individual Defendants. In addition, the Company has incurred, and continues to incur, legal costs in connection with the ongoing Securities Class Action.

125. Plaintiff brings this action derivatively and for the benefit of Malibu to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Malibu, unjust enrichment, and violations of Section 14(a) of the Exchange Act.

126. Plaintiffs will adequately and fairly represent the interests of Malibu and its shareholders in enforcing and prosecuting its rights.

127.     Malibu is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

128.     A pre-suit demand on the Board of Malibu is futile and, therefore, excused. At the time of filing this action, the Board consists of nine directors: Individual Defendants (i) Buch, (ii) Chhina, (iii) Connolly, (iv) Hooks, (v) Lanigan, (vi) Murphy, (vii) Stokely, and (viii) Taylor, as well as non-party (ix) Steve D. Menneto (the "Demand Board"). Plaintiff needs only to allege demand futility as to a majority of the directors (*i.e.*, five directors) who are on the Board at the time this action is commenced.

129.     Plaintiff did not make a demand on the Demand Board prior to bringing this stockholder derivative suit because, as set forth below, a majority of the Demand Board faces a substantial likelihood of personal liability and is therefore incapable of making an independent and disinterested decision to bring the claims herein.

130.     Demand is excused as to the eight Individual Defendants currently on the Demand Board because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements regarding its "elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen Tommy's dealerships". As a result, the Company's sales performance, market share, and stock value were artificially inflated. The Company was also withholding certain incentives and rebates from its dealers and that, because of the foregoing, the Company faced substantial risk of litigation from one of its top dealers, Tommy's, and the Company's CEO departed due to his role in this scheme as described herein. The scheme was intended to make the Company appear more profitable and attractive to stockholders. The

Demand Board defendants breached their fiduciary duties, face a substantial likelihood of liability and are not disinterested. Demand upon them is futile and this excused.

131.   The Demand Board defendants, together and individually, violated and breached their fiduciary duties by knowingly approving and/or permitting the wrongs alleged herein and participating in efforts to conceal those wrongs.

132.   Additionally, the eight Individual Defendants on the Demand Board willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

133.   The Demand Board defendants, as members of the Board, were and are subject to Malibu's Code of Conduct. The Demand Board defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Demand Board defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

134.   Moreover, the Audit Committee Defendants solicited the 2023 Proxy. The 2023 Proxy was false and misleading in violation of Section 14(a) of the Exchange Act. Therefore, demand upon them is futile and further excused.

135.   Demand is further excused as to Defendant Buch. Defendant Buch has served as a Company director since February 2014. The Company provides Defendant Buch with significant compensation for his role as stated above. As such, Defendant Buch cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received

by Defendant Buch render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Buch breached his fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Buch is futile and excused.

136.    Demand is further excused as to Defendant Chhina. Defendant Chhina has served as a Company director since February 2014. The Company provides Defendant Chhina with significant compensation for his role as stated above. As such, Defendant Chhina cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Chhina render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a Company director he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Chhina breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Chhina is futile and excused.

137.    Demand is further excused as to Defendant Connolly. Defendant Connolly has served as a Company director since February 2014. The Company provides Defendant Connolly with significant compensation for his role as stated above. As such, Defendant Connolly cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the

financial benefits received by Defendant Connolly render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a Company director he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Connolly breached his fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Connolly is futile is excused.

138. Demand is further excused as to Defendant Hooks. Defendant Hooks is Chairman of the Board and has served as a Company director since February 2014. The Company provides Defendant Hooks with significant compensation for his role as stated above. As such, Defendant Hooks cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Hooks render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Hooks breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Hooks is futile and excused.

139. Demand is further excused as to Defendant Lanigan. Defendant Lanigan served as a Company director since February 2014. The Company provides Defendant Lanigan with significant compensation for his role as stated above. As such, Defendant Lanigan cannot independently consider any demand to sue himself for breaching his fiduciary duties to the

Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Lanigan render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Lanigan breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Lanigan is futile and excused.

140.    Demand is further excused as to Defendant Murphy. Defendant Murphy served as a Company director since February 2014. The Company provides Defendant Murphy with significant compensation for his role as stated above. As such, Defendant Murphy cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Murphy render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Murphy breached his fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Murphy is futile and excused.

141.    Demand is further excused as to Defendant Stokely. Defendant Stokely served as a Company director since February 2014. The Company provides Defendant Stokely with significant compensation for his role as stated above. As such, Defendant Stokely cannot

independently consider any demand to sue himself for breaching his fiduciary duties to the Company because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Stokely render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Stokely breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Stokely is futile and excused.

142. Demand is further excused as to Defendant Taylor. Defendant Taylor served as a Company director since April 2023. The Company provides Defendant Taylor with significant compensation for her role as stated above. As such, Defendant Taylor cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Taylor render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Taylor breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Taylor is futile and excused.

143. Furthermore, Defendants Buch, Chhina, Stokely, and Taylor have served as members of the Audit Committee during the Relevant Period. As such, they are responsible for

the integrity of Malibu's financial statements. Specifically, the Audit Charter provides that the Audit Committee is responsible for:

> The Committee is appointed by the Board to assist the Board in, among other things, overseeing the accounting and financial reporting processes and the audits of the financial statements of the Company and its financial risk management policies and controls and assisting the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting, auditing, internal control and financial reporting practices of the Company. In addition, the Committee is appointed by the Board to assist the Board in overseeing the Company's risk management with respect to data privacy, cybersecurity and information technology risks.

144.    In their capacities as Audit Committee members, Defendants Buch, Chhina, Stokely, and Taylor reviewed and approved materially misleading statements and allowed the m to be disseminated in Malibu's SEC filings and other disclosures. Thus, Defendants Buch, Chhina, Stokely, and Taylor breached their fiduciary duties, are not disinterested, and demand is excused as to them for this additional reason.

145.    Consequently, this shareholder derivative action should be allowed to proceed.

## COUNT I

**Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

146.    Plaintiffs incorporate by reference and re-allege each allegation set forth above, as though fully set forth herein.

147.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

148.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

149.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

150.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy was materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2023 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

151.    The false and misleading elements of the annual Proxies led to the re-elections of several of the Individual Defendants to the Board, allowing them to continue breaching their fiduciary duties to Malibu.

152.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy.

153. Plaintiff, on behalf of Malibu, has no adequate remedy at law.

## COUNT II

**Against Individual Defendants for Breach of Fiduciary Duties**

154. Plaintiffs incorporate by reference and re-allege each allegation contained above, as though fully set forth herein.

155. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Malibu's business and affairs as directors and/or officers of the Company.

156. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

157. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

158. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

159.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

160.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

161.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

162.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Malibu has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

163.     Plaintiff, on behalf of Malibu, has no adequate remedy at law.

## COUNT III

### Against Insider Trading Defendants for Unjust Enrichment

164.     Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

165. By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Defendants Anderson and Springer were unjustly enriched at the expense and to the detriment of Malibu.

166. Defendants Anderson and Springer either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Malibu tied to the performance or artificially inflated valuation of Malibu, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

167. Plaintiff, as a stockholder and a representative of Malibu, seeks restitution from the Demand Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by Defendants Anderson and Springer due to their wrongful conduct and breach of their fiduciary duties.

168. Plaintiff, on behalf of Malibu, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Malibu and that Plaintiff is a proper and adequate representative of the Company;

B. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C. Directing Malibu to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Malibu and its stockholders from a repeat of the

damaging events described herein, including, but not limited to strengthening the Company's internal reporting and financial disclosure controls;

D.    Awarding punitive damages;

E.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: April 8, 2025                    Respectfully submitted,

                                        s/*Paul Kent Bramlett*
                                        Paul Kent Bramlett (TN #7387)(MS#4291)
                                        Robert Preston Bramlett (TN #25895)
                                        **BRAMLETT LAW OFFICES**
                                        P.O. Box 150734
                                        Nashville, TN 37215
                                        Tel: (615) 248-2828
                                        Fax: (866) 816-4116
                                        pknashlaw@aol.com

                                        *Counsel for Plaintiff*

OF COUNSEL:

**POMERANTZ LLP**

Gustavo F. Bruckner
Samuel J. Adams
Ankita Sangwan
600 Third Avenue
New York, NY 10016
(212) 661-1100

**SHUMAN, GLENN & STECKER**

Kip B. Shuman
100 Pine Street, Suite 1250
San Francisco, CA 94111
(303) 861-3003

Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
(303) 861-3003

Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003

## <u>VERIFICATION</u>

I, John M. Schulz, hereby verify that I am familiar with the allegations in the foregoing Verified Stockholders Derivative Complaint (the "Complaint"). I have held shares of Malibu Boats, Inc. at all times relevant to the Complaint. I have reviewed the allegations in the Complaint and, as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate, and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason, I believe them to be true. Having received a copy of the foregoing Complaint and having reviewed it, I hereby authority its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4⁷ᵗʰ day of ~~March~~ APRIL, 2025.



John M. Schulz